**SIMMS OIL CO. v. COMMISSIONER OF INTERNAL REVENUE.**

**No. 19.**

Circuit Court of Appeals, Second Circuit.
Jan. 21, 1935.

Edward Cornell and J. Sterling Halstead, both of New York City (Rhodes S. Baker, of Dallas, Tex., and Roger Hinds, of New York City, of counsel), for petitioner.

Frank J. Wideman, Asst. Atty. Gen., and Sewall Key and Carlton Fox, Sp. Assts. to Atty. Gen., for respondent.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

Three unrelated questions are presented for review. They will be considered separately and the essential facts as to each stated in connection with the point discussed.

E. F. Simms, a man interested in the oil business in Texas, in 1919 bought a considerable number of leases on what it was hoped would prove to be profitable oil-bearing land scattered through twenty counties in Texas. All but one were adjoining counties. The general location of the land was favorable and the time auspicious for a development not only of oil production but of a stock holding and stock selling scheme which would

bring in a large amount of money from the public. Simms paid $972,012.94 for the leases. He then discussed finances and development with a Mr. Bronner, who brought him in touch with men of finance in New York City. Arrangements, it is now unnecessary to relate in extended detail, were finally made which led to the organization of the petitioner, Simms Oil Company, a Texas corporation having 10,000 shares of capital stock of a par value of $100 per share, and to the organization of Simms Petroleum Company, a Delaware corporation with a capital stock of 500,000 shares of no par value. The Simms leases were assigned in 1919 to the petitioner for all of its stock except six qualifying shares of directors. Then Simms transferred all of the petitioner's stock which he had received in exchange for the leases to Simms Petroleum Company for 280,990 shares of its stock. Out of this block of stock so received he had agreed to, and did, transfer to Mr. Bronner, his associate in the venture, 56,000 shares, leaving 224,990 shares as the consideration finally received by Simms for his leases. The stock of Simms Petroleum Company was listed on the New York Curb Exchange and large amounts were sold to the public. During the summer of 1919, a pool in this stock was operated by Simms and his associates and later a second pool was organized. The stock was thus sold on the market at prices ranging from $28.50 to $73.50 per share. None of the stock of the petitioner was sold.

■ In 1923 some of the leases were found to be worthless, and they were abandoned. So, too, some were abandoned in 1925 for the same reason. Part of the losses so claimed to have been sustained in 1923 were carried over and deducted from income in 1925 by the petitioner in a consolidated income and profits tax return it filed as a member of an affiliated group of corporations. All of the losses so claimed to have been suffered in 1925 were also deducted, leaving no tax due. The percentage of the losses sustained in 1923 and 1925 were stipulated, but the amount in each year is disputed. The Commissioner refused to accept the cost of the leases as claimed by the petitioner and determined a deficiency based upon a lower basis. The Board of Tax Appeals found the cost of the leases to petitioner to be the same as their cost to Simms, and this finding is now claimed to have been arbitrarily made without due regard to the evidence. Accordingly, the first issue is whether or not the Board based its finding of cost upon substantial evidence. We think it did. While it is apparent that the cost of the leases to Simms was not necessarily the cost to the petitioner and that the petitioner's cost was the fair market value of its stock at the time the stock was exchanged for the leases provided that stock then had a fair market value, the fact is that none of the petitioner's stock was sold and no fair market value was shown. An attempt has been made to persuade us that, because the petitioner's stock was immediately exchanged for stock in the holding company, Simms Petroleum Company, which has been plausibly computed to have had a fair market value of $5,624,750, the petitioner's stock was actually worth that. It is likewise urged upon us that, because petitioner's stock had a par value of $10,000,000 and all but six shares of it was issued in exchange for the leases which were taken as payment in full for the stock which had to be issued fully paid for under the laws of Texas, the leases actually cost the petitioner $9,999,400, though this theory of cost seems to have been advanced only as a makeweight to help establish the contention that the leases must have cost the petitioner more than the amount the Board found. The cost now seriously urged is the claimed fair market value of the Simms Petroleum Company stock which was exchanged for the petitioner's stock.

We need not do more than point out that the Board was not required to accept any such theoretical value for the petitioner's stock. It was essential to the plan for a market operation in the holding company's stock to have the petitioner's stock transferred to the holding company and to have the holding company thus control the Simms leases. But to say that, when the petitioner's stock was issued for the leases, it had a fair market value in excess of the actual value of the leases loses sight of realities. The acquisition of the leases was an absolute necessity in carrying out the stock selling operation contemplated and subsequently indulged in. Any value the petitioner's stock may subsequently have had in excess of the value of the leases has not been so conclusively proved to have existed at the time it was issued that other evidence of value before the Board could not overcome it. There was other evidence.

■ Mr. Simms became involved in disputes with his associates because of some claimed secret profits made by him and by them in the conduct of the operations, and he also had litigation with the government regarding taxes assessed against him as a result of income received in connection with these transactions. It was stipulated that, so far as mate-

rial and relevant, the evidence introduced in the case of E. F. Simms v. Commissioner of Internal Revenue before the Board should be treated as in this case. While the right to object to any portion of it was reserved to both parties, that right was not exercised. This evidence shows that witnesses qualified to express opinions on the subject placed the value of the leases when acquired by the petitioner at an amount ranging from less to more than Simms paid for them. In view of this evidence, it is reasonable to believe that they were worth, when the petitioner acquired them, at least what Simms paid for them, but no more. We therefore are bound to accept the Board's finding that the value of the petitioner's stock used to pay for the leases was the same as the value of the assets underlying the stock immediately after the leases were transferred to it, since there was substantial evidence to support the finding. The losses deductible in 1925 then become simply a matter of computation from facts either stipulated or properly found, and the Board's decision on this issue is affirmed.

The second issue related to a deduction claimed in the return for 1925 based on a loss alleged to have been sustained by the petitioner in 1923 as a result of its purchase from Simms Petroleum Company of the capital stock of Rowe Oil Corporation.

In 1923, Simms Petroleum Company not only owned, a few qualifying shares being ignored, all of the stock of the petitioner, but also owned all of the stock of Rowe Oil Corporation, an operating company. This stock of Rowe had been acquired by Simms Petroleum Company in part in December, 1919, and in part in December, 1920. Payment for it had been made in part in cash and in part in stock of Simms Petroleum Company. Rowe Oil Corporation was financially unsuccessful. Simms Petroleum Company made cash advances to it in excess of half a million dollars and forgave and canceled, without other consideration than the resulting benefit to it as the sole stockholder, such advances to the amount of $356,767.77. On December 31, 1923, Rowe Oil Corporation still owed Simms Petroleum Company $145,158.59 on account of such loans. On that day Simms Petroleum Company and the petitioner agreed that Simms Petroleum Company would immediately surrender, or cause to be surrendered, for cancellation, all of the outstanding shares of Rowe Oil Corporation, and that in consideration the petitioner would pay Simms Petroleum Company $1,182,053.24. On that day Rowe Oil Corporation transferred all of its assets to the petitioner in consideration of the assumption by petitioner of all the obligations of Rowe Oil Corporation and its undertaking to cause all the outstanding shares of Rowe Oil to be surrendered for cancellation. Rowe Oil Corporation was then dissolved, and the fair market value of its assets as of December 31, 1923, the date of dissolution, in excess of all its obligations other than its indebtedness to Simms Petroleum Company, was $99,669.38. Simms Petroleum Company sustained net losses in 1923, 1924 and 1925. The petitioner had net income in each of those years. The loss claimed by the petitioner has been computed by adding the amount of the indebtedness on December 31, 1923, of Rowe Oil Corporation to Simms Petroleum Company, $145,158.59, to the $1,182,053.24 which petitioner paid to Simms Petroleum for the Rowe Oil Corporation stock which was canceled, and then taking from the total the liquidation value of Rowe Oil Corporation computed at $99,669.38 by disregarding the amount Rowe owed Simms Petroleum Corporation. When this indebtedness is taken into consideration in determining the liquidation value of Rowe Oil Corporation on the day the petitioner purchased its stock for $1,182,053.24 in cash, it appears that the petitioner paid that amount for stock in a corporation whose liabilities exceeded its assets by $45,489.21.

The Board held that the form of the transaction by which this loss was created was not controlling in determining whether the loss was deductible from petitioner's gross income, but that, being in substance a transfer of a loss from Simms Petroleum Corporation, which had no net income from which it could be deducted, to the petitioner which did have such income, it was not deductible by the petitioner.

The petitioner would justify its claim of right to take the deduction on the theory that intercompany transactions between affiliates should not be judged on principles applying to the acts of separate and distinct legal entities, and that at the time this loss was created the law had not been definitely construed to the effect that a net loss could be carried over and deducted in a subsequent year only by an affiliate out of its own income in the subsequent year. See Woolford Realty Co. v. Rose, 286 U. S. 319, 52 S. Ct. 568, 76 L. Ed. 1128, decided in 1932. This seems only to be an attempt to support the deduction on the ground that the petitioner could not have been sure on December 31, 1923 that the only way the then existing Simms Petroleum loss

could be used to reduce taxation was by transferring it to the petitioner, and so that it could not have been a deliberate attempt to distort the petitioner's net taxable income in the year in question. Even so, the real character was not changed. As much would follow from the apparent fact that the petitioner could not have been sure in 1923 either that Simms Petroleum Corporation would not have net income in 1925 from which to deduct its loss or that the petitioner would. Whenever a loss of one affiliate is in whole or in part taken over by another under circumstances which show that in so far as the loss was shifted the affiliate taking it over has simply made a contribution in the nature of a gift to the other, no deductible loss results. If what happened in fact amounted to more than the making of bookkeeping entries, the petitioner made a gift to Simms Petroleum Company of what it claims to be a loss. To be sure it was then out of pocket to the extent of the amount claimed. In that sense it sustained a loss, but to recognize it as a loss deductible from income for taxation purposes would permit a computation of net income on a basis other than that provided by Congress. There would be no point in requiring the deduction of a loss by an affiliate only out of its own income if losses could be shifted within the group as affiliates might desire and agree. We think that to give effect to the limitation upon carry-over deductions shown by the decision in Woolford Realty Co. v. Rose, supra, it must follow that losses by one affiliate cannot be transferred to another in the consolidated group. Not all intercompany dealings are disregarded in determining the net income of a consolidated group for purposes of taxation, Helvering v. Post & Sheldon Corporation (C. C. A.) 71 F. (2d) 930, but those which would distort the actual net income of the group by permitting a loss to be deducted other than from the income of the unit which sustained the loss are not to be given effect. See Burnet v. Aluminum Goods Co., 287 U. S. 544, 53 S. Ct. 227, 77 L. Ed. 484. The actual loss had been sustained before December 31, 1923, and that occurred when it was suffered by Simms Petroleum Corporation. On December 31, 1923, it was merely rearranged within the group with the loss remaining the same as before from the standpoint of a consolidated return. On this issue the decision of the Board is affirmed.

On October 19, 1922, Clayton Oil & Refining Company acquired from Gasoline Products Company, Inc., the right to install a plant of a daily capacity of 30,000 barrels and to manufacture that quantity of gasoline under certain gasoline cracking patents owned by Gasoline Products Company, Inc. On October 9, 1924, Clayton assigned to Atlantic Oil & Refining Company two-thirds of its rights to manufacture gasoline under the patents and Atlantic took a license from Gasoline Products. The contracts entered into need not be outlined except to say that provisions satisfactory to all were incorporated in their agreements which fixed the number and size of the units and the time within which they should be installed. Gasoline Products was to receive a royalty from Atlantic, and, pursuant to an agreement to discharge the liabilities of Atlantic to Clayton arising under the assignment, bound itself to pay to Clayton, as and when the royalties were paid to it by Atlantic, $8 per unit of one thousand barrels of the capacity assigned by Clayton to Atlantic. What is now important is only the fact that, as a result of these agreements and payments made by Atlantic to Gasoline Products, Clayton became entitled to receive in all $160,000 from Gasoline Products.

On May 14, 1925, G. M. Murphy & Co., which owned a controlling amount of the stock of Clayton, agreed to sell to Simms Petroleum Company a minimum of 5,000 of the 7,500 shares of Clayton preferred stock and a minimum of 13,000 of the 19,630 shares of Clayton common stock outstanding. Agreements were made, the validity of which is not questioned, which provided that all sums to be paid to Clayton as a result of the assignment to Atlantic and the promise of Gasoline Products to pay Clayton as and when it received the royalties from Atlantic were to become the property of the persons who were Clayton stockholders just prior to the delivery of Clayton shares to Simms Petroleum under the Murphy & Co. contract to sell such shares to Simms Petroleum. Provision was made for the purchase by Simms Petroleum of any rights reverting to Clayton because not exercised and paid for by Atlantic; and Simms Petroleum agreed to pay over to Murphy & Co. for the account of the holders of the common shares of Clayton the amounts which would become due to Clayton for the rights exercised by Atlantic under the assignment and from the sale of reverted rights.

It was understood that Clayton would be dissolved, and on July 2, 1925, its directors passed a resolution authorizing the transfer of all its assets to the petitioner upon condition that the petitioner assume all its outstanding obligations, "except its obligations of liquidation to its stockholders" and that the

petitioner acknowledge itself indebted to Simms Petroleum Company in the sum of $861,872.71 plus whatever sums might be received by the petitioner on account of the assignment to Atlantic and which were to be paid by Simms Petroleum to Murphy & Co. for the benefit of Clayton stockholders as provided in the agreement between Simms Petroleum and Murphy & Co.

Pursuant to these arrangements, Clayton was dissolved on December 28, 1925. Atlantic paid its royalties to Gasoline Products, and, beginning on October 16, 1925, Gasoline Products drew eight checks payable to Clayton which made up the total $160,000 due it under the agreement. The last of these checks was dated October 1, 1926. All of these checks were indorsed to the order of Simms Petroleum, were received by Simms Petroleum, were deposited in its bank account, and the amount less a reserve for federal income taxes was paid over to Murphy & Co. for the account of former Clayton stockholders. Of the $160,000 so received, $139,886.97 was paid over to Murphy & Co., and of this $1,043.38 was returned by Murphy & Co. to Simms Petroleum on October 7, 1926, making a total of $21,156.41 which was held by Simms Petroleum as a tax reserve and credited to the petitioner upon its books. None of the registered holders of Clayton stock, when that stock was transferred to Simms Petroleum, were at any time registered holders of Simms Petroleum stock during 1925. None of the payments made by Gasoline Products were ever actually received by the petitioner. The Commissioner added the payments made by Gasoline Products in 1925 to the petitioner's gross income in that year and those made in 1926 to the petitioner's 1926 gross income and determined deficiencies accordingly. The Board sustained the deficiencies so determined.

The petitioner argues that the royalty payments were not its income, because whatever they amounted to were their cost which had to be paid to Petroleum; because the old Clayton shareholders owned the equitable title to them; and because they were an asset distributed to the old Clayton stockholders through an informal dividend in kind.

Whether these payments were income to the petitioner cannot be decided on any theory that they can, on the question of cost, be singled out and considered as separate from the remainder. The consideration moving from the petitioner was entire, in that all of it was for all of the Clayton assets. It was all for all in one purchase. That the payments served as the measure in part of the consideration to be paid for all does not permit the amount determined by the use of them as a measure to be attributed to the cost of them alone. It was their value, to be sure, but the promise to pay that amount as a part of the consideration was what enabled the petitioner to get all of the assets. At least that was the effect of the agreement made and that is what now controls.

So far as they are now important, the steps taken to turn the Clayton assets over to the petitioner consisted of a resolution adopted on July 1, 1925, by the executive committee of Simms Petroleum Company on the stated premise that Simms Petroleum had or would acquire 99.9 per cent. of the preferred and 99.5 per cent. of the common stock of Clayton, and that—

"(1) Whereas, it seems advisable for Simms Oil Company, the operating subsidiary of this Company, to conduct the refining and distributing operations taken over in the acquisition of Clayton Oil & Refining Company centering at Dallas, Texas, it is

"Resolved, that the officers of this Company, and of its subsidiary, Simms Oil Company, be and they hereby are authorized to take whatever steps may be necessary or advisable to dissolve Clayton Oil & Refining Company and to transfer its assets to Simms Oil Company."

This was followed by a resolution by the Clayton board of directors on July 2, 1925, providing "(2) That Simms Oil Company, in consideration of the transfer to it of such properties, shall acknowledge itself indebted to Simms Petroleum Company in the sum of $861,872.71, plus whatever sums may be received by Simms Oil Company from time to time representing proceeds of assignment of rights to 20,000 barrels cracking capacity, as set forth in contract between Simms Petroleum Company and G. M. P. Murphy and Company, dated June 10, 1925, and that it shall execute to Simms Petroleum Company such evidence of indebtedness as may be agreed upon between such companies; Simms Petroleum Company to undertake to liquidate the outstanding shares of Clayton Oil & Refining Company, at the rate of $100.00 per share for each share of Preferred Stock; and $6.389132 per share for each share of Common Stock, plus (to holders of Common Stock only) a proportionate amount of such sums so received on account of assignment of rights, less Federal income taxes payable with respect thereto, and to acknowledge itself to have received in liquidation of its interests

and shares in Clayton Oil & Refining Company full satisfaction for the same in the aforesaid obligation to it of Simms Oil Company."

Afterwards, and at or shortly after the transfer of the Clayton assets to the petitioner, Simms Oil, Simms Petroleum, and Clayton made an agreement in part as follows:

"This agreement witnesseth that Simms Petroleum Company agrees to and acquiesces in said sale of assets of Clayton Oil & Refining Co. to Simms Oil Company in consideration for an open account receivable from Simms Oil Company in the amount of $861,-872.71 plus certain additional sums as set forth above and Simms Petroleum Co. agrees and undertakes to liquidate the interests of the other stockholders in Clayton Oil & Refining Co. by paying to holders of common stock $6.389132 per share, plus a proportionate share of sums received on account of assignment of rights to 20,000 barrels of cracking capacity, less Federal income taxes, payable in respect thereto."

From the foregoing it will be seen that the petitioner did not undertake to turn over to Simms Petroleum the identical payments as and when it received such payments on account of the royalties to be paid over by Gasoline Products when received from Atlantic, but merely agreed to give Simms Petroleum an open account receivable equaling $861,672.71 plus whatever might be the amount of such payments. It simply became indebted to Simms Petroleum on open account to the extent of $861,872.71 plus such sums as it might receive from the payment of royalties by Atlantic under the assignment. No matter how the total of it was arrived at, all the petitioner promised to give Simms Petroleum was an open account receivable. Had those payments ever been actually received by the petitioner, they would have been free assets in its hands. Simms Petroleum at most had only a right of action against the petitioner to collect its debt represented by the account receivable. The petitioner could have discharged that debt by paying Simms Petroleum out of any of its funds. All the title to the royalty payments themselves, both legal and equitable, would have been in the petitioner as soon as it received them. Of course, it never actually did receive them, but the receipt of those checks by Simms Petroleum directly from Clayton discharged pro tanto the obligation of the petitioner to pay Simms Petroleum the debt it owed on open account. In that way the petitioner has had the full benefit of the payments, since they have been used to pay in part the purchase price of all the Clayton assets it bought and received. It is immaterial that we have no means of knowing all that the petitioner did pay for the Clayton assets, since the Clayton liabilities it assumed are not given, or that the price was not paid directly to Clayton. The important thing is that the petitioner got the title to the Clayton assets undiminished by any equitable lien and was free to dispose of them as it chose. Its acquiescence in the transfer of the royalty payments directly from Clayton to Simms Petroleum was but the exercise of its freedom of choice in respect to their disposition.

That there was nothing in the nature of an informal dividend in kind by the Clayton Company is made very plain by the fact that the right to receive the payments was one of the assets it actually transferred to the petitioner instead of reserving it so that the payments might be distributed as a dividend to Clayton stockholders without first becoming available to the petitioner for use, if it so desired, in discharging in part its promise to pay the purchase price. As before stated, the Clayton Company, which was not a party to the contract between Murphy & Co. and Petroleum providing that the payments should become the property of certain Clayton stockholders, was not by that agreement divested of its property. It not only did not ratify that agreement, but transferred the right to receive the payments to the petitioner without recognizing the agreement for the benefit of the stockholders. We may assume that those stockholders were not harmed by the transfer to the petitioner, but that is due not to the creation of any equitable interest in the royalty payments for the benefit of stockholders by the agreement of Murphy & Co. and Petroleum relating to property which neither of the contracting parties then owned, but because the petitioner elected to permit Petroleum to receive them in part payment of its account receivable.

Of the checks made payable by Gasoline Products to Clayton and endorsed over to Petroleum, two of $16,000 each were drawn on January 2, 1926, and were treated as 1926 income of the petitioner. It is claimed that, if these amounts were income to the petitioner in any year, they should have been included in 1925 rather than 1926, because they were credited to the Clayton Company on the books of Gasoline Products on December 21, 1925, and December 31, 1925, respectively. Article 51 of Reg. 69, promulgated under the

Revenue Act of 1926, followed the well-settled principle that income accrues when it is credited to a taxpayer and becomes subject to his disposal without restriction. If such were the fact, the income credited in 1925 should have been included in the gross income of petitioner for that year instead of for 1926, for the petitioner reported income on the accrual basis. But the Board justifiably refused to find as a fact that this income was unqualifiedly at the disposal of the petitioner as soon as it was credited on the books of Gasoline Products. On the facts as found, it was correctly included in income for 1926.

Affirmed.